291 F.2d 709
 Ioannis KOUFOPANTELIS et al., Libellants-Appellees,
v.
CIA. DE NAV. SAN GEORGE, S.A., Respondent-Appellant.
Fanorios PANTELOGLOU, Libellant-Appellee,
v.
CIA. DE NAV. SAN GEORGE, S.A., Respondent-Appellant.
Diamantis DRAKOPOULOS et al., Libellants-Appellees,
v.
CIA. DE NAV. SAN GEORGE, S.A., Respondent-Appellant.
Spiridon BARDIS, Libellant-Appellee,
v.
CIA. DE NAV. SAN GEORGE, S.A., Respondent-Appellant.
Ioannis KOUFOPANTELIS et al., Judgment Creditors-Appellees,
v.
CIA. DE NAV. SAN GEORGE, S.A., Judgment Debtor,
SANTA MARIA SHIPOWNING & TRADING COMPANY, S.A., et al., Third-Party Appellants.
 Nos. 174-177.
 No. 134.
 Dockets 26526-26529.
 Docket 26288.
 United States Court of Appeals Second Circuit.
 Argued January 4, 1961.
 Decided May 26, 1961.
 
 John B. Whalen, New York City, for appellants.
 Chadbourne, O'Neill & Thomson, New York City, for Santa Maria Shipowning & Trading Co. and others.
 Herbert Lebovici, Issaac Salem, New York City, for libellants-appellees.
 Alfange & Friedman, New York City, for third-party-appellant Cargo & Tankship Management Corp., Philip A. Friedman, New York City, of counsel.
 Before LUMBARD, Chief Judge, and WATERMAN and HAND, Circuit Judges.
 HAND, Circuit Judge.
 
 
 1
 These are appeals from four decrees of Cashin, J., in suits in admiralty, each refusing to reopen decrees taken by default in favor of the libellants in four suits to recover seamen's wages. There were six libellants in each of two of the suits and one libellant in each of the other two. In all the suits the claims were for wages, statutory penalties for delay in payment of wages, unlawful discharge or other claims for the payment of specified sum of money, not necessary to state. In a libel filed by Bardis alone a claim was joined for personal injuries due to the respondent's neglect to give him medical treatment. The libellants had all been members of the crew of respondent's ship, "Santa Despo," registered in Panama at the time when the claims arose. The libels were filed and the respondent served in December 1955 and October 1956, but the respondent did not answer in any of the suits and the libellants took final decrees by default on April 30, 1959 and June 17, 1959. On May 20, 1960, the respondent moved in each of the suits to reopen the defaults and to be allowed to answer. Judge Cashin denied the motions, but modified the decree in the Bardis suit by requiring the respondent as a condition of contesting the amount of the damages "to file a bond of $5,000 as security for any decree entered upon such inquest."
 
 
 2
 Admiralty Rule 28, 28 U.S.C.A., provides that, if the respondent fails to answer the libel on the return day of the process, the court may pronounce him to be "in contumacy and default," and may then "proceed to hear the cause ex parte"; or it "may set aside the default" and allow the respondent to answer "on such terms as the court may direct." Rule 39 cuts down to 60 days any motion of the respondent to "rescind the decree in any suit in which, on account of his contumacy and default, the matter of the libel shall have been decreed against him." These two rules mean that, if the respondent has failed to answer, the court may proceed to dispose of the case without notice, or may allow him to answer; but Rule 39 gives the court discretion to rescind a decree that has pronounced him in default within a period of sixty days after the default decree has been entered. Thus, applied to the suits at bar nothing could be done after sixty days to change the decrees entered on default, which had unconditionally declared that the libellants should recover the amounts fixed in the decrees themselves. That part of the decree in the Bardis suit that refused to rescind the imposition of liability for neglect to give Bardis medical care was subject to the same rule; as was the reservation of any liquidation of the amount of damages. The condition that the respondent must file a bond as security was within the court's discretion, especially in the light of the allegations that the respondent had been removing its assets from the district.
 
 
 3
 It is true that Judge Cashin did not rely upon Rule 39 as an answer to the respondent's motion, but decided it on what he conceived to be the inadequacy of the defense presented, particularly the allegations that the libellants had given releases of any claim at the time they were discharged from the ship. Nevertheless, Rule 39 did apply, for there is nothing in the words quoted that confines it to final decrees. Moreover, we cannot see why with the exception of the Bardis decree the decrees were not final. As we have said, they were for the recovery of a fixed sum of money, and constituted the final action of the court in disposal of the libels. Rule 39 was as complete a bar to any relief under Rule 28 as though the Rule had been a statute; it was an answer to the motion regardless of the merits of the defenses that might have been available. So far as Afghan Motor Co. v. The M. V. Silverash, D.C., 46 F.Supp. 306, decides to the contrary we cannot concur.
 
 
 4
 Six of the libellants in one of the suits at bar claim the right to collect their decree in that suit from several other corporations by a supplementary proceeding under § 794 of the New York Civil Practice Act, which Rule 20 of the Admiralty Rules makes "available" to suits in admiralty. They allege that the respondent, the San George Company, had assets formerly in the possession of another corporation, which we shall call "Cargo," which "Cargo" paid to other shipowning corporations (the "third party ships") in fraud of the libellants' claims in suit. "Cargo" and these shipowners, they assert, are liable for money paid in fraud of themselves, as judgment creditors of the San George Company. They demanded judgment upon their claims which Judge Palmieri granted. The situation is complicated and the motion was decided upon depositions and affidavits. The facts, so far as we can understand them, were as follows. The respondent — The San George Company — owned two ships, not only the "Santa Despo," but the "Santa Despoina," the management of all of whose local transactions was entrusted to a corporation, by the name of "Mar-Trade." "Mar-Trade" acted as agent, not only of the ships, "Santa Despo" and "Santa Despoina," but of other ships collectively known as the "Santa Group," and owned by corporations of which the San George's shareholders were also shareholders. Each month "Mar-Trade" sent a statement to each corporation showing a detailed account of receipts and disbursements. On December 31, 1958, the agency of "Mar-Trade" was cancelled, but the same powers were granted to "Cargo." Thereafter "Cargo" accounted for the ships "Santa Despo" and "Santa Despoina" in the same way as "Mar-Trade" had done. Already in 1955 the San George Company had sold the "Santa Despo," and late in 1958 or early in 1959, it sold the "Santa Despoina" for more than $800,000, and the amount of both sales appeared as credits to the San George Company in "Cargo's" account for the month of June 1959. However, on July 31, 1959, in this account the credit for the "Santa Despoina" had disappeared, a debit of over $12,000 had been substituted, and the credit for the "Santa Despo" had become only $405. The only explanation offered for these changes is that they were made by "auditors" appointed by the owners of seven or more of the ships that "Cargo" was managing as the "Santa Group," and that they showed the true obligations of the Santa Group inter se.
 
 
 5
 The question on which the validity of the summary judgment depends is as follows. All the ships in the "Santa Group" were owned by separate corporations of which, however, two Greek citizens were also shareholders, and all local transactions that involved these ships were left for decision to an agent in New York who was a relative of these shareholders. This agent acted as ship's husband for all Santa ships through "Cargo," and allocated the debits and credits apparently at the direction of this agent, but, as we may assume, under the supervision of the two Greek shareholders.
 
 
 6
 On June 30, 1959 "Cargo" remitted to the respondent, San George Company, one of the "Santa Ships," an account showing a credit of over a million dollars for the "Santa Despoina" but in the account for July 31, 1959, this item was replaced by a debit of more than $12,000. This, as the libellants maintain, was enough to justify the conclusion that "Cargo" had diverted to the other members of the "Santa Group" more than enough cash to pay the judgment of the libellants and to justify a summary judgment, not only against "Cargo," but against these corporations. "Cargo" denies that it received any part of the proceeds of the "Santa Despoina," except as an agent for the San George Company, and alleges that all that it did receive it paid to the "third party" corporations under authority of all the Santa Group. Accordingly, "Cargo" claims to be liable only to the Santa Group and to them only for a balance of $15,000 as shown by their books. "Cargo" does not attempt to allocate this sum among the group.
 
 
 7
 Out of the tangle of rights and obligations in which the two Greek shareholders involved their dealings it is extremely difficult to make any distribution of these payments. However, it appears to my brothers that on this record the libellants proved that the proceeds from the sale of the "Despoina" were deflected from the creditors of the San George Company without consideration and in fraud of the libellants, judgment creditors of that company. It seems to me that the relations between the corporations owning the "Santa Ships" were too complicated to decide summarily and I think that the decree in the summary proceeding should be reversed and the issues should be remanded to the district court for trial as that court may decide.
 
 
 8
 The judgments affirming the libellants' judgments against the San George Company are unanimously affirmed. The order in the summary proceeding directing the "third party shipowning corporations" to pay the decrees is affirmed by a majority vote. The order directing "Cargo" to pay the libellants is reversed. The order requiring the respondent to post a bond is affirmed. All the orders involved, even if any be interlocutory, are appealable under § 1292(3), Title 28.
 
 
 9
 LUMBARD, Chief Judge (concurring in part, and writing for the majority in part).
 
 
 10
 Judge WATERMAN and I agree fully with our senior that Judge Cashin's refusal to reopen the default decrees in favor of libellants was proper since San George was on notice that the decrees had been entered; we also agree that the order in the summary judgment proceeding directing "Cargo" to pay the libellants should be reversed. We think, however, that the other order in the summary proceeding directed to the "third party shipowning corporations" which ordered them to satisfy the libellants' judgment should be affirmed since the corporations' allegations fall short of creating a "genuine issue of fact" which only a trial could resolve.[1] Their halfhearted, contradictory and imprecise affidavits do not amount to an allegation that San George was indebted to them.
 
 
 11
 It is admitted, or cannot be challenged, that Compania De Navegacion San George (San George), the respondent in the main action, sold the Santa Despoina for $907,000 in early January of 1959. This sum was deposited in an account at the First National City Bank and over a two-month period it was transferred by Pandelis A. Margaronis to the Santa Despoina's account with "Cargo." Since the ship was no longer operating for San George, its account remained quite static and on June 30, 1959 its balance with Cargo was over $1,830,000. But by the end of July, quite another story was told on the books of Cargo, for the Santa Despoina was then shown to be indebted to it by over $12,000. Partial beneficiaries of the depletion of the $1,830,000 balance of the Santa Despoina were the balances that the "third party shipowning corporations" had with "Cargo." To the Santa Maria Shipowning and Trading Corporation went $753,564.11; to the Panathena Trading and Shipowning Corporation went $312,540.45, and benefited by $68,243.32 was Compania De Navegacion San Martine.
 
 
 12
 The following chronology is also clear from the record: On June 17, 1959, the judgment debtors' default decrees were entered and on July 20, 1959, the third parties first became aware of the default judgments against their sister corporation when Martrade Corporation was served with a third-party subpoena. Four days later, on July 24, 1959, Cargo's books were changed.
 
 
 13
 The third parties now contend that the changes made on Cargo's books merely reflect San George's debt to its sister corporations. The third parties, however, have not made a single meaningful allegation to support this claim. Neither a hint of how such obligations came into being nor a straight-forward assertion that such obligations existed have they made.
 
 
 14
 Indeed, when Pandelis A. Margaronis, whose brother was the corporations' principal stockholder and who served as the New York manager, first was questioned, his deposition was that he personally knew of no debts owing from San George to her sister corporations. His later vague and off-hand suggestion that "[the corporations] might have inter-company transactions which have taken place abroad * * * and they might give them to us so that we will adjust them," is an interesting speculation but hardly sufficient to create an issue of fact for trial. Equally ephemeral and insufficient is the affidavit of Locke Grayson, an accountant who was retained by Pandelis Margaronis, that the changes were made to "adjust the balances in [the Cargo accounts] * * * to conform * * * with the correct balances as stated in the books of said corporations." The books could have reflected San George's agreement to make a transfer without consideration just as well as some debt owing from San George to its sisters. Surely if there were such debts owing, the shipowning corporations should have set forth some of the underlying facts surrounding their creation. It is no excuse that they have destroyed their books, as Pandelis A. Margaronis asserts, and thus may no longer be able to recall their past dealings.
 
 
 15
 The third parties had it in their power to state the facts with respect to any debt that San George might have owed them and it was incumbent upon them to be explicit; inconclusive and vague assertions are not enough to create an issue of fact. As the third parties have failed to make any explanation of the facts alleged by the plaintiffs, we treat those facts as if they were true.
 
 
 16
 Without a genuine claim that the changes in the Cargo accounts were made on account of obligations previously incurred by San George and owing to the third parties, Judge Palmieri's finding that the third parties are indebted to San George was quite proper. If, as Cargo claims, the shipping corporations were treated as a group and if the third parties had debit balances on Cargo's books before the changes, the existence of a credit balance for San George and a debit balance for the third party corporations would reflect debts owing from the third parties to San George. If the corporations were treated as a group but a third party had a credit balance, transferral of San George's balance to it would give it the cause of action that San George had had against whatever shipowning corporations had debit balances. Such a transaction, rendering San George insolvent, Cohen v. Benjamin, 3d Dept. 1936, 246 App.Div. 866, 284 N.Y.S. 884; Berndt v. Berndt, 192 Misc. 57, 60, 79 N.Y.S.2d 143 (S.Ct. Onondaga Cty.), would be a fraudulent conveyance under the New York Debtor and Creditor Law, § 273, cf. § 270, which creates a cause of action in the defrauded creditors under § 278. On the other hand, if each shipowning corporation were treated by Cargo as a separate entity, the transaction would similarly be in fraud of creditors though it would be a fraudulent transfer of a cause of action against Cargo rather than of a cause of action against whatever shipowning corporations had negative balances.
 
 
 17
 The Santa Maria Shipowning and Trading Company, Compania De Navegacion San Martine, and Panathena Trading and Shipowning Company therefore must pay enough of what they owe to San George to satisfy the plaintiff's judgment against San George.
 
 
 
 Notes:
 
 
 [1]
 The proceeding against the third parties was brought under § 794 of the New York Civil Practice Act, applicable in the district court by virtue of Rule 69(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The statute, as construed, requires that there be a trial whenever there is a "genuine issue of fact." Kerckafric Ltd. v. Maxwell Meyers Affiliations, Ltd., D.C.S.D.N.Y.1952, 108 F. Supp. 594, 595
 Section 794 states that the court "must grant" an order requiring payment by the third party to the judgment creditor "if it shall appear to the satisfaction of the court [that the third party is indebted to the judgment debtor] unless the said third party * * * shall show such facts as may be deemed by the court sufficient to entitle [him] to a trial." The New York courts have held that this means that a trial is required where there is a "real controversy" but not where the plaintiff's right is "substantially undisputed," Kenney v. South Shore National Gas & Fuel Co., 1911, 201 N.Y. 89, at pages 92 and 93, 94 N.E. 606, at page 607; cf. Bank of United States v. Canal Securities Co., 1st Dept. 1937, 250 App.Div. 505, 294 N.Y.S. 760. This seems to us to be a standard identical to the "genuine issue of fact" rubric prescribed for the summary judgment procedure, F.R.Civ.P. 56(c), with which we are more familiar and so it was held in Kerckafric, supra.
 
 
 
 18
 WATERMAN, Circuit Judge (concurring in part in the opinion of Judge HAND and concurring in full in the opinion of Judge LUMBARD).
 
 
 19
 I concur in the portions of Judge HAND'S opinion that Judge LUMBARD states he and I concur in. Otherwise, I concur in the opinion of Judge LUMBARD.